## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**BOBBIE J. BROWNLEE,**

     **Plaintiff,**

**vs.**                                    **CASE NO. 4:05cv197-RH/WCS**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

     **Defendant.**

_____/

### REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D). It is recommended that the decision of the Commissioner be reversed.

**Procedural status of the case**

Plaintiff, Bobbie J. Brownlee, applied for disability insurance benefits. She alleges disability commencing on November 1, 1999, her last day of work. She was insured for disability benefits through the date of the Administrative Law Judge's decision, November 16, 2004. R. 12, 18. Her last insured date was December 31, 2004. Doc. 15, p. 2.

Plaintiff alleges disability due to a head injury she suffered in 1985, causing headaches, seizures, loss of balance, dizziness, memory and visual problems, and side effects of medication.  Plaintiff was 45 years old at the time of the administrative hearing, had an associates of arts degree from Tallahassee Community College, and had past relevant work as a telephone operator, collections clerk, customer services representative, and an administrative clerk.  The Administrative Law Judge found that Plaintiff has the residual functional capacity to do her past relevant work, and was not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

"A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Analysis**

**Plaintiff's testimony**

Plaintiff testified that her work as a collections representative for Sprint was a sitting job, talking on the telephone. R. 357. Her job as a customer service representative for Sprint was much the same, a sedentary job, talking to various people on the telephone and using a computer. R. 358-359.

Plaintiff said she left her last job, the customer service representative position, in 1999 because she was missing two weeks of work out of each month. R. 382. She said that was why she was fired. R. 383.

Plaintiff said that since her head injury in 1985, she had experienced increasingly severe migraine headaches.  R. 362.  She sees her treating physician, Dr. Ayala, a neurologist, about every six months.  *Id.*  She said that she has experienced a continuous headache in the summer for two months.  *Id.*

With respect to the efficacy of the medications that Plaintiff takes to control her headaches, the ALJ noted that Plaintiff was prescribed Effexor[1] and Zomig.[2]  R. 366.  Then the following exchange took place:

ALJ:   And that appears to do a fairly decent job of controlling your headaches or at least giving you some decent relief.  Is that true?

A:   When I have them.

Q:   Well, when you have them?

A:   Yeah.  I am – I can only get six a month.  And I usually have it more than six headaches a month.  And I wait until it –

Q:   Well –

A:   Until I make –

Q:   You said the headaches may not always be at the same intensity.  Is that correct?

A:   I wait until I make sure that it's going to be a really bad one before I take it.

Q:   Uh-huh.

---

[1] Effexor is indicated for the treatment of depression.  PHYSICIANS' DESK REFERENCE (2004), p. 3413.

[2] Zomig is used for the acute treatment of migraine headaches.  PHYSICIANS' DESK REFERENCE (2004), p. 708.

A:     Which Dr. Ayala told me I shouldn't do.  But I only have so
       many.  And I don't want to waste them.

R. 367.  Plaintiff said that when she had Zomig available, it helped her headaches "fine"

but Zomig made her "very" or "extremely sleepy."  R. 369.

Plaintiff testified that she experienced migraine headaches two to four times a

week.  R. 379.  She said that the pain of these headaches was "extremely bad where I

couldn't even open my eye."  R. 381.  She said the pain was eight or nine on a scale to

ten.  *Id.*  Plaintiff said that when she took Zomig for such a headache, she would "go to

sleep."  R. 381.  The medication helped.  *Id.*  She said that she had to wait four or five

hours before taking Zomig because "I want to make sure, it's so bad."  *Id.*  She said that

when she first feels a headache, she takes aspirin.  *Id.*  Aspirin does not work, though.

R. 382.

Plaintiff said she had had a headache that lasted two months.  R. 379.  In

October or November of 2003 she had had a headache for one month or more.  *Id.*  She

said:

Just that it does – it's really disabilitating [sic].  I can't do much.  I don't do
anything hardly at all.  They last for months on end. . . .

R. 383.

Plaintiff also said that she suffers from seizures, and said that the seizures were

controlled at the time of her testimony.  R. 363.  The administrative hearing was on April

24, 2004.  R. 351.  She said that this changes from time to time.  R. 363.  She agreed

that in order to have a valid driver's license, she had to be seizure free for a year, and

she had a driver's license.  *Id.*  The license, issued in 2000, was good until 2006.  R.

364.  She said she takes her seizure medicine and tries to control her seizures.  R. 365.

Plaintiff's attorney said that at the time of the hearing, Plaintiff had not been seen by Dr. Ayala since August, 2003.  R. 368.  Plaintiff explained that she had not had seizures in this eight or nine month period prior to the hearing.  R. 370.

Plaintiff was treated for bleeding ulcers caused by excessive use of aspirin.  R. 372.  She had internal bleeding.  R. 374.  She said she was urged to use Tylenol, but Tylenol was not effective and she was prescribed Darvocet.  *Id*.  Darvocet "helped a lot" with her back pain (not her headaches).  R. 374-375, 378.

Plaintiff said that she did laundry and dishes at home, but mostly did nothing.  R. 373-374.  She said she read popular novels.  R. 376.  She watched television about four hours a day.  *Id*.  She said she was able to follow along with books and with television.  *Id*.

**The medical evidence**

Plaintiff was seen by a neurologist, Ricardo Ayala, M.D., on July 9, 1993.  R. 221.  Plaintiff had suffered a head injury in 1985.  *Id*.  She had a history of seizures, migraine headaches, and difficulties with concentration.  *Id*.  After her head injury, Plaintiff needed prolonged physical, occupational, and speech therapy.  *Id*.  Dr. Ayala noted in 1993 that she had been seizure free for the past three years, using a combination of Dilantin, Klonopin,[3] and Depakote, "but not without significant over-sedation and increased sleep."  R. 221.  She reported significant difficulties with concentration at work due to "the large dose of medication she's presently taking."  R. 22.  Dr. Ayala's assessment was seizure disorder secondary to multiple brain contusions.  R. 223.  He

---

[3] Klonopin is a brand name for Clonazepam, an anticonvulsant prescribed for control of petit mal and other seizures.

thought she was presently experiencing significant side effects from her medications.
*Id.*

Plaintiff was continuously treated by Dr. Ayala in 1994 and 1995.  R. 207-221.
On September 28, 1995, Plaintiff was seen by Dr. Ayala.  R. 207.  She had been
seizure free for five years, but had had a grand mal seizure two weeks earlier.  *Id.*  He
found her to be very mildly weak on her left extremities, and markedly weak on the right.
*Id.*  She had some visual field deficits and she had right sided lid drop.  *Id.*  She said she
had felt "a little bit disoriented, headachy, no appetite, nauseated, and has had some
flashing lights in the left eye, which is something that has been consistent with her
previous migraines."  *Id.*

On March 20, 1996, Plaintiff reported having had an occasional migraine
headache, was under a great deal of stress, and admitted to being depressed.  R. 203.
She had had a seizure in January, 1996, following surgery, and she had "Dilantin
toxicity in the past."  R. 204.  It had been "extremely difficult to return to work because
she has a busy job with the phone company."  *Id.*  Dr. Ayala's assessment was seizure
disorder, apparently well-controlled with Dilantin, but with some toxicity.  R. 203.

On November 7, 1996, it was noted that Plaintiff suffered chronic neck pain,
secondary migraine headaches, and chronic pain in the left shoulder.  R. 202.  Her
seizures were well-controlled.  *Id.*  She had fallen down stairs at work, causing two
fractures of her left tibia.  *Id.*

On July 20, 1998, Plaintiff was treated by John L. Ness, M.D., for a migraine
headache.  R. 160.  She reported that the headache had lasted five days.  *Id.*  The

migraine symptoms continued on July 23, 1998.  *Id.*  She had been assessed as having

migraines on June 25, 1998.  *Id.*

On September 8, 1998, Plaintiff saw Dr. Ayala, reporting that she got migraine

headaches

> on an almost daily basis and it is only part of the day.  There are certain
> portions of the day where she feels just fine.  Today is one of those days
> when she is not feeling very good.

R. 193.  Dr. Ayala planned to use Imitrex[4] and Elavil.  *Id.*  Dr. Ayala said:  "Obviously, in

the interim, I don't think she is capable of going back to work . . . ."  *Id.*

On October 7, 1998, it was noted by another physician that Plaintiff had been

seeing Drs. Van Tassel and Ayala for chronic migraine headaches.  R. 159.  On

October 12, 1998, Dr. Ayala saw Plaintiff.  She reported her headaches were less

frequent and intense, and were responding to Imitrex.  R. 192.  He said:  "We obviously

are seeing a different person this time."  *Id.*

On March 2, 1999, Plaintiff reported that she continued to have migraine

headaches despite taking Elavil and Prozac.  R. 158.  She also had labile hypertension.

*Id.*

On March 24, 1999, Plaintiff told Dr. Ayala that she did not think she could

handle her current job, and she thought "it is in her best interest to try to see what a

period without the job does."  R. 187.  Dr. Ayala was "a little hesitant" to believe that rest

would help unless it was on a "long-term basis."  *Id.*  He thought, however, that this was

"the way to go" because Plaintiff was

---

[4] Imitrex is used for the acute treatment of migraine headaches.  PHYSICIANS' DESK
REFERENCE (2004), p. 1529.

consuming quite a bit of Imitrex and this is simply because of her headaches. They do not seem to respond just to Elavil alone. I have seen her before and I know that when she had a period of rest, she would do much better.

R. 187. Dr. Ayala concluded that he thought

the best thing she can do at this point is to be on disability. I have known this patient for a long time, so I have a strong feeling that this, indeed, will be the best situation.

*Id.*

On May 24, 1999, Dr. Ayala found that Plaintiff's headaches "have reduced substantially since we last saw her on 3/24/99." R. 186. He said it seemed to be working so far, and "th[e] fact that she is not working at this point, and if that is the way that she can get better, obviously we will continue to support her in that respect." *Id.* He planned to see her again in six months or sooner if needed. *Id.*

On November 16, 1999, it was noted that Plaintiff was "experiencing about three headaches per month typically severe and so far do not seem to respond very well to Imitrex anymore," that is, Imitrex by injection. R. 185. Migranal nasal spray was prescribed. *Id.* It was noted that "seizure wise she has been okay." *Id.*

On July 18, 2000, it was noted that seizures were well-controlled and she had been doing "fairly well in terms of headache control," but she was at home, resting. R. 184. In late August, 2000, Plaintiff had a "breakthrough generalize[d] seizure" as she left Dr. Ayala's office. R. 182-183.

On January 11, 2001, she was seen again by Dr. Ayala reporting that she had had three seizures in the prior six weeks. R. 181. One of the seizures occurred on Friday, November 17, 2000, when she was driving, causing an accident. R. 182, 151.

Dr. Ayala noted that this was "completely unusual given the number of years that she went without any seizures on Dilantin plus Klonopin together."  R. 181.  He noted her headaches were "a little better with Effexor."  *Id.*

On May 10, 2001, and again on May 11, 2001, Plaintiff had seizures.  R. 164. On June 20, 2001, she seemed to be "tolerating relatively well the combination of" Dilantin, Trileptal,[5] and Klonopin, and her headaches were doing better with Effexor.  R. 177.

On October 16, 2001, Plaintiff was evaluated by Paul S. Deitchman, a clinical psychologist.  R. 230.  She was found to be responsive, pleasant, coherent, and had good recall of historical details.  R. 231.  Dr. Deitchman found her mood to be depressed.  *Id.*  She was not suicidal, delusional, or hallucinatory.  *Id.*  He thought that "formal assessment of her intellectual and memory function could be enlightening."  R. 232.  The diagnosis was depressive disorder, NOS, and probable cognitive disorder, NOS.  *Id.*

On October 29, 2001, Dr. Ayala found that Plaintiff's seizures had been totally in control with three medications, "but not with headaches."  R. 225.  Dr. Ayala said:

> Patient continues to experience headaches especially when she is stressed out.
>
> Patient has had numerous medication combination[s] with poor results and is not [sic] until Effexor that we have been able to achieve certain degree of stability.  Patient seems to be very prone to stress when she goes back to work.

---

[5] Trileptal is prescribed for partial seizures.    PHYSICIANS' DESK REFERENCE (2004), p. 2324.

R. 225.  He found that Plaintiff continued to experience "word finding difficulties since the last seizure."  *Id.*  He found her seizure disorder to be well controlled, and her chronic headaches to be partially controlled.  *Id.*

On June 5, 2002, Dr. Ayala found that Plaintiff continued to have frequent headaches, but not on a daily basis.  R. 287.  She had been seizure free for a year.  *Id.*  He released her with no driving restrictions.  *Id.*

On August 12, 2003, Dr. Ayala found Plaintiff to be doing relatively well.  R. 284.  Her headaches were "not daily but still occurring."  *Id.*  Seizure control was adequate on Dilantin, Klonopin, and Trileptal.  *Id.*

On March 10, 2004, Dr. Ayala completed a form indicating without comment that Plaintiff's condition equaled or met Listing 12.02 (Organic Mental Disorders).  R. 297.

**Whether remand is needed to obtain a complete transcript**

The Commissioner filed a supplement to the transcript, adding a missing page 392.  Docs. 16 and 18.  This issue, therefore, is moot.

**Whether the ALJ's findings as to the severity of Plaintiff's experience of headaches and seizures is supported by substantial evidence in the record and whether the ALJ gave appropriate weight to the opinion of the treating physician**

The Administrative Law Judge determined that Plaintiff's "vascular headaches" and seizures were "well-controlled by medication."  R. 13.  He said:  "During periods when symptoms became more frequent, Dr. Ayala was able to experiment with various combinations of medications until good results were obtained."  *Id.*  He found that Plaintiff's seizures occurred "mainly due to lack of medication when she was undergoing some type of surgery."  R. 14.  He also said that

the record leads one to the conclusion that those seizures or headaches that were not hospital or surgery related were most likely due to medication non-compliance.  When she was not in the hospital and when she adhered to her prescribed medications, her seizures and headaches remained well-controlled.

*Id.*  In reaching these conclusions, the ALJ cited portions of the medical record from 1993 to 2003.  R. 13-14.

These findings do not consider the record as a whole and, as a consequent, are not supported by substantial evidence in the record.  The record citations provided in Defendant's memorandum are illustrative of the problem.  Defendant points to the finding in July, 2000, that Plaintiff had been doing "fairly well" with headache control.  Doc. 17, p. 10, citing R. 184.  That is not precisely what Dr. Ayala said.  He said that "she had been doing fairly well in terms of headache control *however it was at the expense of being home resting* after she burned both feet."  R. 184 (emphasis added).  Dr. Ayala also noted that "for headaches she has been taken [sic] Elavil which is *serving no purpose to help her sleep at night nor it is* [sic] *controlling headaches.*"[6]  *Id.*  He started Plaintiff on Effexor.  *Id.*

The notation that control of headaches was at the "expense" of having to rest at home, and the notation that medications were not effective, is consistent with other observations in Dr. Ayala's notes.  On March 24, 1999, Dr. Ayala had said that Plaintiff

---

[6] On February 2, 1999, a year and one-half earlier, when Dr. Ayala said: "Headache-wise, she has been almost completely under control on Elavil, 100 mg., *at the expense of feeling tired.*"  R. 189.  He also said that "if something could be done about the side effects, that would certainly be welcomed, but not that she [sic] is willing to sacrifice the control that she has of her headaches just because of the *drowsiness* that she has."  *Id.* (emphasis added).

was consuming "quite a bit of Imitrex" for headaches and he found that Elavil did not

help.  R. 187.  He said:

> I have seen her before and I know that when she had a period of rest, she
> would do much better. . . . [T]he best thing she can do at this point is to be
> on disability.  I have known this patient for a long time, so I have a strong
> feeling that this, indeed, will be the best situation.

*Id.*  On May 24, 1999, Dr. Ayala found that Plaintiff's headaches "have reduced

substantially since we last saw her on 3/24/99."  R. 186.  He said it seemed to be

working so far, and "th[e] fact that she is *not working at this point*, and if that is the way

that she can get better, obviously we will continue to support her in that respect."  *Id.*

(emphasis added).  On November 16, 1999, it was noted that Plaintiff was "experiencing

about three headaches per month typically severe and so far do not seem to respond

very well to Imitrex anymore," that is, Imitrex by injection.  R. 185.  On January 11,

2001, and June 20, 2001, Dr. Ayala found that Plaintiff's headaches were better with

Effexor, R. 181, 177.  On October 29, 2001, however, Dr. Ayala found that Plaintiff's

headaches were not controlled with medications.  R. 225.  Dr. Ayala said:

> Patient continues to experience headaches especially when she is
> stressed out.
>
> Patient has had numerous medication combination[s] with poor results
> and is not [sic] until Effexor that we have been able to achieve *certain
> degree of stability.  Patient seems to be very prone to stress when she
> goes back to work*.

R. 225 (emphasis added).   On June 5, 2002, Dr. Ayala found that Plaintiff continued to

have "*frequent* headaches," but not on a daily basis.  R. 287 (emphasis added).  On

August 12, 2003, Dr. Ayala found that Plaintiff's headaches were "not daily but still

occurring."  R. 284.  He said that "Effexor and Zomig are still making a difference."  *Id.*

In summary, when considered as a whole, Dr. Ayala noted that Plaintiff continued to have frequent headaches, the headaches often were controlled somewhat with Effexor and Zomig, and the headaches responded to rest at home, i.e., when Plaintiff was not under the stress of work.  Also, the undisputed evidence is that Plaintiff suffered significant side effects from the medications (drowsiness and ulcers from use of too much aspirin).

There is nothing in the record to indicate that Plaintiff has not been compliant with her medications.  Defendant refers to the passage from the administrative hearing set forth above as Plaintiff's acknowledgment that she had "decent relief" when she had sufficient medication.  Doc. 17, p. 11, citing R. 367.  The phrase "decent relief" was in the ALJ's leading question, and Plaintiff's response related to the efficacy of Zomig.  R. 367.  She said that she was allowed only six pills of Zomig a month, but since she had more headaches than that a month, she saved the medication for the most severe headaches.  *Id.*  She also said that Zomig made her "extremely sleepy."  *Id.*  She said that when she took Zomig for such a headache, she would "go to sleep."  R. 381.  Plaintiff was treated for bleeding ulcers caused by excessive use of aspirin.  R. 372.  From this it is difficult to understand how the ALJ concluded that Plaintiff was not compliant as to her headache medications.

Further, it was error for the ALJ to fail to consider the significant side effects from the use of Zomig, causing Plaintiff to be very sleepy or to have to sleep, the ulcers caused by excessive use of aspirin, or the role that home rest has played in the control of her headaches.  The need to rest at home to control severe headaches is significantly inconsistent with ability to undergo the stresses of work.

The Administrative Law Judge's determination that Plaintiff's seizures were under control, however, is supported by substantial evidence in the record as the record stood on the date of his decision.  On July 18, 2000, it was noted that seizures were well-controlled.  R. 184.  In late August, 2000, Plaintiff had a "breakthrough generalize[d] seizure" as she left Dr. Ayala's office.  R. 182-183.  On January 11, 2001, she was seen again by Dr. Ayala reporting that she had had three seizures in the prior six weeks.  R. 181.  One of the seizures occurred on Friday, November 17, 2000, when she was driving, causing an accident.  R. 182, 151.  Dr. Ayala noted that this was "completely unusual given the number of years that she went without any seizures on Dilantin plus Klonopin together."  R. 181.  On May 10, 2001, and again on May 11, 2001, Plaintiff had seizures.  R. 164.  On June 20, 2001, she seemed to be "tolerating relatively well the combination of" Dilantin, Trileptal,[7] and Klonopin.  R. 177.  On October 29, 2001, Dr. Ayala found that Plaintiff's seizures had been totally in control with three medications, "but not with headaches."  R. 225.  In summary, the evidence up to the time of the administrative hearing showed a period of seizure activity (six seizures), but that by June, 2001, Dr. Ayala had been able to bring this under control with three medications, and there was no evidence of seizures prior to the hearing on April 21, 2004.

### Evidence submitted after the administrative hearing

Additional medical evidence was submitted to the Appeals Council after the administrative hearing and after the ALJ's decision, on November 16, 2004.  R. 2A.  The Appeals Council denied review.  R. 3.  The Appeals Council considered the new

---

[7] Trileptal is prescribed for partial seizures.    PHYSICIANS' DESK REFERENCE (2004), p. 2324.

evidence, but found "that this information does not provide a basis for changing the

Administrative Law Judge's decision."  R. 4.  Plaintiff seeks review of the decision of

both the Administrative Law Judge and the Appeals Council.  Doc. 1, p. 2.

When the Appeals Council has denied review and a claimant seeks review of that

decision, the denial of the Appeals Council is subject to review in this court if it "amounts

to an error of law."  Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir. 1998), *cert. denied*,

525 U.S. 1124 (1999) (dicta);[8]  Williams v. Commissioner of Social Security, 407

F.Supp.2d 1297, 1302 (M.D. Fla. 2005); Hurley v. Barnhart, 385 F.Supp.2d 1245, 1253-

1254 (M.D. Fla.), *aff'd*, 147 Fed.Appx. 103 (11th Cir. 2005); Zaldivar v. Apfel, 81

F.Supp.2d 1353, 1363 (N.D. Ga. 2000); Haws v. Apfel, 61 F.Supp.2d 1266, 1285-1286

(M.D. Fla. 1999).

> To review the AC's denial of review, courts will have to look at the
> pertinent evidence to determine if the evidence is new and material, the
> kind of evidence the AC must consider in making its decision whether to
> review an ALJ's decision.

Falge v. Apfel, 150 F.3d at 1324.  Evidence is "new and material" "if it relates to the

period on or before the date of the administrative law judge hearing decision."  *Id.*,

*quoting* 20 C.F.R. § 404.970(b).

On July 30, 2004, a few months before the administrative law judge's decision,

Plaintiff was seen by Dr. Ayala after a "very bad seizure where [s]he sustained a bite to

the tongue and many bruises to the back."  R. 341.  He otherwise found her to be "very

stable on her seizure regimen."  *Id.*  Dr. Ayala was skeptical that she had had a seizure,

---

[8] In Falge, the claimant had not sought review of the decision of the Appeals Council
to deny review.  150 F.3d at 1324.

but instead, thought that she had had a fall from her new bed.  R. 342.  He did not think the bed was safe for Plaintiff, with her history of seizures.  *Id.*

On September 7, 2004, Plaintiff was taken to the hospital when her mother and son found her unresponsive, wedged between furniture in her room.  R. 317.  She was found upon examination to be "awake and mildly agitated," did not follow commands, and was "nonverbal."  *Id.*  She had diminished function of the left side of her face with a half-closed eyelid.  R. 318.  A CT scan of the head revealed "encephalomalacia[9] in the right cerebellar area and right parietal and occipital areas and both frontal lobes," unchanged from a CT scan in 2001.  *Id.*

On September 29, 2004, still before the ALJ's decision, Plaintiff was examined by Dr. Ayala, who made the assessment of "intractable epilepsy."  R. 340.  He found that "her current seizure regimen is not optimal especially with the type of seizure that she has been having lately."  *Id.*  On November 24, 2004, Dr. Ayala examined Plaintiff, finding:

> She's obviously not able to work for the time being.  I expect that she will not be able to work due to her restrictions on driving an[d] unstable seizure disorder for at least six-month[s].

R. 338.  On January 14, 2005, Plaintiff went to the hospital with a concussion and a bleeding contusion of the head.  R. 344.  The cause was a possible seizure.  *Id.*  She was discharged to home health care with physical therapy at her home.  *Id.*

_____

[9] Softening of the brain, especially that caused by an infarct.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:

http://www.mercksource.com/pp/us/cns/cns_hl_dorlands.jspzQzpgzEzzSzppdocszSzus zSzcommonzSzdorlandszSzdorlandzSzdmd_a-b_00zPzhtm.

On February 1, 2005, Plaintiff was evaluated by Dr. Ayala.  R. 336.  Headaches continued to be a problem and she continued to take Effexor.  *Id.*  It was noted that she had required "many visits to the emergency room or hospitalization" due to "breakthrough seizures."  *Id.*  The assessment was "intractable epilepsy."  *Id.*  Dr. Ayala was very concerned about the stability of her condition.  R. 335.

On February 22, 2005, Dr. Ayala saw Plaintiff again, finding that she was experiencing ataxia.  R. 334.  She was having trouble walking, with balance, and almost fell that day.  *Id.*  Dr. Ayala stated:

> It is clear to me th[at] Bobbie is in no condition to hold a job for any significant period of time.  She requires lots of medical care and the stability of her condition is very frail.  It is my hope that she will get to help the [sic] she needs from Social Security and disability.

R. 331.

On March 10, 2005, Dr. Ayala found that Plaintiff was "definitely feeling better" and suspected that "the previous time" was due to "Dilantin overload."  R. 330.  Her headaches were "still occurring but better than before."  R. 329.  He found that she was "not capable of going back to work at least for the short to medium term."  *Id.*

On March 15, 2005, an EEG was performed on Plaintiff.  R. 328.  Dr. Ayala found it to be an "abnormal EEG suggesting disorganized background, slow background, epileptic discharges."  *Id.*  Plaintiff's Dilantin levels were at the "high therapeutic range."  R. 327.  It was noted that the EEG showed "very active epileptic activity" and "clearly suggest[s] a predisposition to seizures."  *Id.*

This evidence is new and material.  This was evidence of Plaintiff's health both before and after the final decision of the Administrative Law Judge.  The period of the

evidence, from late July, 2004, through March, 2005, is continuous and not unreasonably beyond the date of the ALJ's decision.

It was error for the Appeals Council to deny review of the ALJ's decision in the face of this evidence. The evidence showed that Plaintiff's headaches were still occurring. More seriously, it showed that Dr. Ayala felt that Plaintiff's condition was very frail, her epilepsy was "intractable," and "very active epileptic activity" was shown on the EEG. The finding that Plaintiff's epilepsy had no serious effect upon Plaintiff's ability to do her past relevant work was seriously eroded by this new evidence.

Plaintiff cites the Williams decision for the proposition that a sentence four remand is required. "To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim." Hurley, 385 F.Supp.2d at 1251-1252. Both errors have occurred here. It was legal error for the Appeals Council to deny review and, upon consideration of the new evidence, the final decision of the Commissioner is not supported by substantial evidence as to either Plaintiff's experience of headaches or her epilepsy. A sentence four remand will not be recommended, however, as the record so plainly shows that Plaintiff is unable to work due to a combination of her seizure disorder, migraine headaches, and depression, all stemming from organic brain damage.

### Whether the determination at step 2 that Plaintiff's depression was not a "severe" impairment is supported by substantial evidence

The ALJ found that Plaintiff's depression was not "severe" at step 2 because there was no evidence that it limited her physical or mental ability to do basic work

activities.  R. 15.  At step 2 of the analysis, the issue is whether Plaintiff has shown that

she has a condition which has more than "a minimal effect on her ability to:  walk, stand,

sit, lift, push, pull, reach, carry, or handle, etc."  <u>Flynn v. Heckler</u>, 768 F.2d 1273, 1275

(11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  "In other words, the 'severity' of a

medically ascertained disability must be measured in terms of its effect upon ability to

work, and not simply in terms of deviation from purely medical standards of bodily

perfection or normality."  <u>McCruter v. Bowen</u>, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality

which has such a minimal effect on the individual that it would not be expected to

interfere with the individual's ability to work, irrespective of age, education, or work

experience.' "  <u>Parker v. Bowen</u>, 793 F.2d 1177, 1181 (11th Cir. 1986), <i>citing</i> <u>Brady v.

Heckler</u>, 724 F.2d 914, 920 (11th Cir. 1984), <u>Edwards v. Heckler</u>, 736 F.2d 625, 630

(11th Cir. 1984), and <u>Flynn</u>, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows

only claims based on the most trivial impairments to be rejected.  The claimant's burden

at step two is mild."  <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986)

(clarifying <u>Brady</u>).  A "severe impairment" is a "de minimis requirement which only

screens out those applicants whose medical problems could 'not possibly' prevent them

from working."  <u>Stratton v. Bowen</u>, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), <i>quoting</i>

<u>Baeder v. Heckler</u>, 768 F.2d 547, 551 (3d Cir. 1985).  It also has been characterized by

the Supreme Court as a criterion which identifies "at an early stage those claimants

whose medical impairments are so slight that it is unlikely they would be found to be

disabled even if their age, education and experience were taken into consideration."  <i>Id.</i>,

*quoting* Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

A licensed psychologist found that Plaintiff had depressive disorder, NOS, and probable cognitive disorder, NOS.  R. 232.  Plaintiff was regularly prescribed Effexor, which is used for depression (though the record also shows it was used to treat Plaintiff's headaches).  Given Dr. Deitchman's notation that further testing was needed, and the duty of the ALJ to make a fair record, it was error for the ALJ to fail to find that this was a "severe" impairment at step 2 without such testing.[10]  By failing to give substantial weight to the opinion of Dr. Deitchman, the ALJ failed to consider the combination of Plaintiff's experience of depression along with her other impairments, notably her experience of migraine headaches and her seizure disorder.  A remand would be needed to consider this issue were it not for the recommendation that benefits be awarded.

> **Whether the determination at step 3 that Plaintiff's brain injury did not meet or equal a listed impairment is supported by substantial evidence**

Dr. Ayala said that Plaintiff's condition equaled or met Listing 12.02 (Organic Mental Disorders).  R. 297.  Listing 12.02 provides:

---

[10] "Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  Sims v. Apfel,  530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), *citing* Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record."  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997), *citing* Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  This basic duty exists whether or not the claimant is represented. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995) (citation omitted).

12.02  Organic Mental Disorders: Psychological or behaviorial abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

    A.  Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

        1.  Disorientation to time and place; or

        2.  Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

        3.  Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

        4.  Change in personality; or

        5.  Disturbance in mood; or

        6.  Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

        7.  Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

    AND

    B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration;

OR

C.  Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Appendix 1 to Subpart P of Part 404, following 20 C.F.R. § 404.1599.

The Administrative Law Judge rejected Dr. Ayala's opinion, finding that there was no evidence of IQ tests or other psychological testing.  R. 14.  The ALJ should have sought such testing, however.

The ALJ also rejected Dr. Ayala's opinion because Dr. Ayala did not identify any medical signs to support this conclusion.  R. 14.  It was noted that in 1998 the CT scan of Plaintiff's brain was negative.  *Id.*  Finally, the ALJ rejected Dr. Ayala's opinion because it was not supported by Dr. Ayala's treatment notes.  *Id.*

Though not in evidence before the ALJ, the Appeals Council had evidence of a CT scan of the head on September 7, 2004, showed encephalomalacia in the right cerebellar area and right parietal and occipital areas and both frontal lobes, unchanged from a CT scan in 2001.  This is evidence of organic brain damage.  It also had EEG evidence of "very active epileptic activity" and clearly suggesting "a predisposition to seizures."  Dr. Ayala found that Plaintiff had seizure disorder secondary to multiple brain contusions.  R. 223.  The medical record shows that this brain injury occurred in 1985, much longer ago than the 2 years required by Listing 12.02(C), and this injury "has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication."  The record also shows "repeated episodes of decompensation, each of extended duration," as required by Listing 12.02(C) 1, that is, the seizures suffered by Plaintiff.  It was error for the ALJ to fail to give considerable weight to the opinion of Dr. Ayala as to Listing 12.02.[11]

**Conclusion**

For these reasons, it is recommended that the decision of the Commissioner be reversed and benefits be awarded.

---

[11] The opinion of a claimant's treating physician must be accorded substantial or considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner be

**REVERSED** and that the court **ORDER** that Plaintiff's application for social security

benefits be **GRANTED**.

**IN CHAMBERS** at Tallahassee, Florida, on March 8, 2006.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**